Filed 12/16/25  P. v. Smith CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KALEAH BEATRICE SMITH,<br><br>    Defendant and Appellant. | B339061<br><br>(Los Angeles County<br> Super. Ct. No. NA103415-03) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James D. Otto, Judge.  Affirmed.

J. Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, David A. Wildman, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Kaleah Beatrice Smith appeals from the judgment after a jury convicted her of first degree murder, attempted murder, and conspiracy to commit murder and found true related firearm allegations. Smith argues (1) the evidence did not sufficiently corroborate the testimony of several of her accomplices; (2) her trial counsel rendered ineffective assistance by failing to argue the evidence did not corroborate the accomplices' testimony and by advancing an argument that was not "viable" and may have offended the jury; (3) the court erred in imposing the middle term, as opposed to the lower term, on her conviction for attempted murder and on the firearm enhancement on her murder conviction; and (4) her trial counsel provided ineffective assistance at sentencing by, among other omissions, failing to present evidence her youth and postpartum depression contributed to her committing the offenses. Because none of Smith's arguments has merit, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

  A. *Smith Conspires To Murder Jason Beaulieu, Succeeds, and Attempts To Murder Jacob James*

In the late afternoon of November 9, 2015 Smith and her housemates (Zariah McCollum, Zaria Tate, and Tate's mother, Joyce Bryant) returned home and found several bullets had pierced the front door and walls of the house.[1] Smith went to

---

[1] Bryant rented the house and lived there with Tate and allowed Smith and McCollum, Tate's childhood friends, to also

speak to a neighbor, who told her three people stood outside Bryant's house shooting and yelling "Blood."[2]

Smith, Tate, and McCollum went to look for Jason Beaulieu, "the first person" they all believed was responsible for the shooting. They suspected Beaulieu because, earlier that day, Beaulieu sent Mariah Johnson (McCollum's cousin) a text message stating McCollum "deserved a bullet" in her head (or words to that effect). Smith had looked through Johnson's phone and saw the text message to Johnson. McCollum believed Beaulieu sent the text message because he was starting a dating relationship with Johnson or because he blamed McCollum for not stopping a fight that involved one of Beaulieu's "homies."

Smith, Tate, and McCollum walked to "the Carmelitos," a housing project where many members of the Bricc Boys criminal street gang lived and saw Beaulieu walking down the street with his friend Jacob James. Smith confronted Beaulieu and accused him of shooting at Bryant's house. Smith started hitting Beaulieu and said, "Blood, I know you did it. Just admit to it, Blood." Beaulieu stated, "Nah, Blood, on Ps I didn't do it."[3] Smith concluded Beaulieu shot at Bryant's house.

Smith, Tate, and McCollum returned to the house. McCollum's mother arrived and told McCollum that she had

---

live there. Most of the details of what happened on November 9, 2015 came from the statements and testimony of McCollum.

[2] Smith was an associate of Inglewood Family Bloods. Jason Beaulieu belonged to West Side Piru, a Blood gang in Compton, and Alejandro Alvarado belonged to the Bricc Boys, a Crip gang.

[3] McCollum explained "Ps" meant the criminal street gang "Piru."

overheard a telephone conversation between Beaulieu and Johnson, where Beaulieu told Johnson, "I just shot that bitch Zariah house . . . . She discovered it." Smith said that Beaulieu "deserve[d] a bullet" and that she wanted Beaulieu "to get shot."

Later that evening, Smith, Tate, and McCollum met with Devontae Reynolds and Alejandro Alvarado. Smith told the two men that Beaulieu shot at Bryant's house, and Reynolds and Alvarado went with the three women back to the house. At some point Reynolds and Smith left. When McCollum called Smith to ask where they went, Smith said she found out where they could find Beaulieu. Alvarado said to Smith, "I want to do this shit. . . . Come back and get us." When Reynolds and Smith returned to the house, McCollum and Alvarado got into the car. Reynolds was driving, and McCollum was in the back seat behind him; Smith was in the front passenger seat, and Alvarado was in the back seat behind her.

Reynolds drove to the area where Smith had confronted Beaulieu earlier that evening; Beaulieu was sitting on some stairs with James, who sat "right behind him." Alvarado said, "Let me get in the front seat and let me do it." Reynolds drove past Beaulieu and James and stopped in a "back street." Smith said, "No. I want to do it. Like, that could've been my baby in the house.[4] Let me do it." Alvarado insisted he could "handle it," and eventually Smith said, "Alright. Are you sure? Like, you sure you gonna do it? Like, don't chicken out, you know, because I could do it myself." Alvarado stated, "Nah . . . I got this."

Smith and Alvarado "swapped seats" so that he was in the front passenger seat and she was in the back seat behind him.

---

4    But it wasn't: Smith's baby was not there at the time.

4

Smith gave a gun she was holding to Reynolds, and Reynolds gave the gun to Alvarado when Alvarado got into the front seat. Reynolds drove the car back to where Beaulieu and James were sitting and slowed down, and Alvarado yelled, "Alright. Y'all get down. Y'all get down." Smith did not get down and said, "No. I want to see this shit." Alvarado fired at least six shots at Beaulieu and James. When Alvarado finished shooting, Reynolds sped away. Alvarado said, "I think I got them both."

Reynolds drove to his house, where he hid the gun. Smith, in an "excited" tone, said to Alvarado, "Thank you. Oh, my gosh, Blood, thank you. I truly appreciate you. Like, . . . if you need anything, like, if you ever need anything, just don't hesitate to ask. Like, I'll do anything for you or whatever."[5]

Reynolds drove the group to a liquor store and then to a gas station, where everyone sat in silence. Smith said to the group, "Alright. We gotta make a pact. Like, this can never leave this car. Nobody else out of this car can know exactly what happened." Smith added, "If anybody asks us where we was tonight or anything like that, just say we went to the homie tattoo shop over there on Fig and El Segundo."

McCollum received a call and told the group that the police had arrived at the scene of the shooting. Reynolds drove back to the Carmelitos housing project, and as Alvarado stood outside the car, he "started throwing up." Reynolds drove the group back to Bryant's house. When Smith saw Bryant and Tate, she said, "Y'all ain't gotta worry about nothing about the house getting shot up again. We already handled it." Smith again said, "You

---

[5]    After that day, Smith and Alvarado began a dating relationship, and Alvarado "routinely" spent the night in Smith's room.

guys don't have to worry about nothing.  We got them."  Bryant asked what happened, and Alvarado described the shooting: "Yeah, I let out the whole clip on him, and I think I got his homie, too."  Smith said, "Yeah, I seen him fold over, so I knew he was hit."  Smith told Bryant and Tate that she told Alvarado that she appreciated what he did and that "if he needed anything . . . ."

Beaulieu died that evening from a gunshot wound to the head.  James left the scene before the police arrived.

B.      *Smith Pleads No Contest to First Degree Murder and, After an Unsuccessful Appeal and Successful Petition for Writ of Habeas Corpus, Withdraws Her Plea*

The People charged Smith, Alvarado, and Reynolds with the murder of Beaulieu (§ 187, subd. (a)) and the attempted willful, deliberate, and premeditated murder of James (§§ 187, subd. (a), 664).[6]  The People also alleged that Smith, Alvarado, and Reynolds committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members, within the meaning of section 186.22,

---

[6]      McCollum agreed to testify for the prosecution and pleaded no contest to a reduced offense, and the trial court sentenced her under an "immunity leniency agreement."  A jury convicted Alvarado of first degree murder and attempted willful, deliberate, and premeditated murder and found firearm allegations true. (*People v. Alvarado* (Feb. 22, 2021, B298355) [nonpub. opn.].) Reynolds pleaded no contest to murder and attempted willful, deliberate, and premeditated murder and admitted firearm and gang allegations.  Reynolds's appeal is pending before this court. (*People v. Reynolds*, B344239.)  Statutory references are to the Penal Code.

subdivision (b)(1)(C), and that a principal personally and intentionally discharged a firearm causing great bodily injury or death, within the meaning of section 12022.53, subdivisions (d) and (e)(1).  On the first day of trial Smith pleaded no contest to first degree murder and attempted willful, deliberate, and premeditated murder and admitted the gang and firearm allegations.  Under the terms of the plea agreement, the trial court sentenced Smith to 25 years to life and imposed and stayed execution of a life term on the attempted murder conviction and terms on the firearm and gang enhancements.  We affirmed Smith's judgment on appeal.  (*People v. Smith* (June 18, 2020, B295351) [nonpub. opn.]).)

In 2021 Smith filed a petition for writ of habeas corpus in the Supreme Court (after this court summarily denied her petition), arguing her trial counsel was ineffective in representing her during her plea hearing.  The Supreme Court directed the Secretary of the Department of Corrections and Rehabilitation to show cause, returnable in this court, why Smith was not entitled to relief.  (*In re Smith* (Aug. 11, 2021, S266965).)  After an evidentiary hearing in the trial court and briefing in this court, we granted Smith's petition and directed the trial court to allow Smith to withdraw her plea of no contest and enter a different plea.  (*In re Smith* (Sept. 15, 2022, B314243 [nonpub. opn.].)

Back in the trial court Smith withdrew her plea, and the court set the case for trial.  The People added a count of conspiracy to commit murder (§ 182, subd. (a)(1)) and alleged the same gang and firearm enhancements as the People alleged on the murder and attempted murder counts.  The People also alleged four aggravating circumstances under California Rules of Court, rule 4.421.

7

C.    *The Jury Convicts Smith of Murder, Attempted Murder, and Conspiracy To Commit Murder, and the Trial Court Sentences Her*

The trial was in April and May 2024.  McCollum testified she could not recall many of the details of what occurred on November 9, 2015.  The prosecutor played the video recording of an interview detectives conducted of her approximately a year after the shooting.  The prosecutor also introduced statements by Reynolds that incriminated Smith.[7]  Tate and Bryant testified about Smith's conduct and statements on November 9, 2015.

Tate testified:  Smith, Tate, and McCollum came home on November 9, 2015 and saw bullet holes in the house, Smith became "loud" and "emotional," called someone, and said, "I need a gun."  Tate accompanied Smith to talk to one of the neighbors, who told them that the shooters were "two guys," one light-skinned and the other dark-skinned, and that the shooters stood outside the house "yelling out 'Blood.'"  When Smith returned to the house, she was "angry," walking "back and forth," and "shouting" and called Alvarado to come pick her up.  Smith, Tate,

---

[7]    The trial court found Reynolds was unavailable because he exercised his right under the Fifth Amendment of the United States Constitution not to testify and refused to answer any questions.  The prosecutor played an audio recording of statements Reynolds made during a *Perkins* operation.  (See *Illinois v. Perkins* (1990) 496 U.S. 292, 300 ["an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings[*] to an incarcerated suspect before asking questions that may elicit an incriminating response"].)  Reynolds described Smith's role in the shooting to two undercover agents who posed as inmates in his jail cell.
     *  *Miranda v. Arizona* (1966) 384 U.S. 436.

and McCollum walked to the Carmelitos housing project and saw Beaulieu walking down the street holding flowers. Smith angrily accused him of shooting at her house, but Beaulieu denied any involvement. Smith grabbed the flowers and began to hit Beaulieu with the flowers; Smith continued to yell at Beaulieu, "I know you did it!"

Smith, Tate, and McCollum returned to the house, with Smith repeatedly saying how angry she was and that it had to be Beaulieu. Smith called someone and yelled, "Come get me. . . . I need to do something about it because my house been shot up and everybody acting stupid like they don't want to do nothing." At approximately 10:30 p.m., someone came by the house to pick up Smith and McCollum.

Later that evening, Tate heard Smith, Alvarado, and McCollum come back to the house. McCollum was crying and told Tate, "I did not know it was going to happen. . . . [Alvarado] shot [Beaulieu]." Smith said to Tate, "There's nothing to worry about. We got him." Smith described for Tate "how it happened" and how "she was gonna do it, but then [Alvarado] took the gun away from her." Alvarado appeared "really shooken up" and said, "Can't believe I did it." Smith told Alvarado, "It's gonna be okay. You don't have to worry. Calm down. We'll take it to the grave." Smith and Alvarado went to Smith's room, and Tate overheard Smith tell Alvarado, "We're in this together. . . . We did this together."

Tate believed Smith was the "aggressor" because Smith was the one who called Alvarado, comforted Alvarado after the shooting, and told the group "'it will be taken to the grave.'" Tate stated Alvarado shot Beaulieu "because of" Smith.

9

Bryant's testimony, like Tate's, described Smith's rage at Beaulieu, her determination not to let him "get away with this," and her frustration at her friends for not doing anything when they saw Beaulieu on the street. Bryant testified: When Alvarado came to the house, Smith "ranted" that the shooter could have killed her baby and that "they needed to find him." Smith said, "You're not gonna do nothing? It's my baby. You're not gonna help me do this?" Smith, Alvarado, and McCollum went out late in the evening and returned in less than an hour. After they returned Smith described what "had occurred" and explained "how they were passing the gun around" because "they didn't know who was gonna do it." Alvarado made a "gun motion with his hand" and said, "No mas." Smith praised Alvarado (calling him a "Trojan") and said she was going to get his name tattooed on her. Smith told the group not to talk about what happened and asked if everyone understood. Bryant believed Smith was the "mastermind" because Smith was "trying to talk [Alvarado] into doing what she wanted him to do," encouraged him to "handle their business", and "kind of made it sound like he was her man and . . . he's supposed to do this for her."

Smith testified in her defense. She denied she told Alvarado that she wanted him to retaliate against Beaulieu for shooting at Bryant's house. Smith stated that Alvarado was "very aggressive" that evening and that, when the group went to look for Beaulieu, she believed Alvarado was just going to "fight" Beaulieu.

The jury found Smith guilty of first degree murder, attempted murder, and conspiracy to commit murder and found true the allegation Smith knew another principal was personally armed with a firearm, within the meaning of section 12022,

subdivision (d).[8]  On Smith's murder conviction, the trial court imposed a term of 25 years to life plus two years for the firearm enhancement; on her attempted murder conviction, the court imposed the middle term of seven years plus eight months (one-third the middle term of two years) for the firearm enhancement; and on her conviction for conspiracy to commit murder, the court imposed and stayed execution of a term of 25 years to life.[9]  Smith timely appealed.

---

[8]      During the hearing on the proposed jury instructions the trial court stated that the jury instruction for the firearm enhancement under section 12022.53 was "withdrawn" and that the court would instruct the jury with CALCRIM No. 3115, which lists the elements for the firearm enhancement under section 12022, subdivision (a).  Counsel for Smith stated he did not object to the instruction.  In her closing argument the prosecutor stated the elements for an enhancement under section 12022, subdivision (d), and the verdict forms asked the jury to make a finding on the firearm allegation under section 12022, subdivision (d).  Smith did not object to the prosecutor's argument or the verdict forms.  (See *People v. Goolsby* (2015) 62 Cal.4th 360, 367 [""'[t]here is no difference in principle between adding a new offense at trial by amending the information and adding the same charge by verdict forms and jury instructions,"'" and the "'defendant forfeits any lack of notice by failing to object'"]; *People v. Fugit* (2023) 88 Cal.App.5th 981, 993-994 [same].)  Smith does not argue that the court erred in giving CALCRIM No. 3115 instead of CALCRIM No. 3117 (which lists the elements for the firearm enhancement under section 12022, subdivision (d)) or that the verdict forms incorrectly stated the firearm allegation.

[9]      After the clerk read the verdicts, the People dismissed the gang and gang-based firearm allegations (§§ 186.22,

11

A.     *The Testimony of Smith's Accomplices Was Sufficiently Corroborated To Support Smith's Convictions*

Smith argues that California law requires testimony from accomplices to be corroborated and that the statements by her accomplices (McCollum and Reynolds) "comprised the only solid evidence supporting the conviction at the close of the prosecution's case."  (Capitalization omitted.)  Smith argues the testimony from witnesses who were not accomplices "did not establish that [she] plotted with [Alvarado] to shoot Beaulieu or helped facilitate the shooting."

1.     *Applicable Law and Standard of Review*

"Under California law, a defendant cannot be convicted of a crime based on the testimony of an accomplice unless that testimony is corroborated by independent evidence that connects the defendant with the commission of the crime."  (*People v. Jasso* (2025) 17 Cal.5th 646, 684; see § 1111; *People v. Hoyt* (2020) 8 Cal.5th 892, 945; *People v. Perez* (2018) 4 Cal.5th 421, 452.)  "'Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone.  [Citations.]  It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified.  [Citations.]  It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy

___

subd. (b)(1)(C), 12022.53, subds. (d), (e)(1)), and the aggravating circumstances allegations (Cal. Rules of Court, rule 4.421).

the jury that the accomplice is telling the truth.'"'" (*Jasso*, at
p. 685; see *Perez*, at p. 452; *People v. Romero and Self* (2015)
62 Cal.4th 1, 32 (*Romero and Self*); *People v. Valdez* (2012)
55 Cal.4th 82, 147-148.) The corroborating evidence "must tend
to implicate the defendant by relating to an act that is an
element of the crime" (*People v. McDermott* (2002) 28 Cal.4th 946,
986), but "does not need to independently prove guilt" (*People v.
Hall* (2024) 104 Cal.App.5th 1077, 1092 (*Hall*)). "A defendant's
own conduct or statements may provide adequate corroboration
for accomplice testimony." (*People v. Jones* (2018) 26 Cal.App.5th
420, 440.) "'The entire conduct of the parties, their relationship,
acts, and conduct may be taken into consideration by the trier of
fact in determining the sufficiency of the corroboration.'"
(*Romero and Self*, at p. 32; accord, *People v. Rodriguez* (2018)
4 Cal.5th 1123, 1128 (*Rodriguez*); *Hall*, at pp. 1091-1092.)[10]

"'The trier of fact's determination on the issue of
corroboration is binding on the reviewing court unless the

---

[10] The court instructed the jury: "If the crimes of murder,
attempted murder, or conspiracy to commit murder or the lesser
included crimes of voluntary manslaughter and attempted
voluntary manslaughter were committed, then Devontae
Reynolds and Zariah McCollum were accomplices to those crimes.
You may not convict the defendant of murder, attempted murder,
or conspiracy to commit murder or the lesser included crimes of
voluntary manslaughter and attempted voluntary manslaughter
based on the statement or testimony of an accomplice alone. You
may use the statement or testimony of an accomplice to convict
the defendant only if: (1) the accomplice's statement or testimony
is supported by other evidence that you believe; (2) that
supporting evidence is independent of the accomplice's statement

13

corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.'" (*Romero and Self*, *supra*, 62 Cal.4th at pp. 32-33; see *People v. Dalton* (2019) 7 Cal.5th 166, 245; *People v. McDermott*, *supra*, 28 Cal.4th at p. 986; *Hall*, *supra*, 104 Cal.App.5th at p. 1092.) If the defendant establishes the evidence was insufficient, and we reverse the conviction, the double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15 of the California Constitution "mandate" the defendant "be acquitted of the charges." (*Rodriguez*, *supra*, 4 Cal.5th at p. 1129.)

### 2. *Independent Evidence Sufficiently Corroborated the Accomplices' Testimony and Statements*

There was ample evidence independent of the statements of McCollum and Reynolds to connect Smith to Beaulieu's murder and to show McCollum and Reynolds told the truth about Smith's leadership role in the crimes. In particular, the testimony of Tate and Bryant about Smith's conduct and statements before, during, and after the shooting of Beaulieu and James sufficiently corroborated the testimony of McCollum and Reynolds.

Tate and Bryant both recounted Smith's anger after seeing the bullet holes in the house and Smith's decision to retaliate against Beaulieu. Tate described the physical confrontation between Smith and Beaulieu in front of the Carmelitos housing project that corroborated McCollum's description. Tate stated that, after the encounter, Smith called Alvarado and complained

---

or testimony; and (3) the supporting evidence tends to connect the defendant to the commission of the crimes."

14

to him that no one wanted to do anything about the shots fired at her house, told him that she needed "to do something about it," and said to "come get" her. Bryant testified Smith was "agitated" and "ranted" at Alvarado that no one had done anything about the shooting and that they needed to find the shooter. Tate's and Bryant's testimony established that Smith had a strong motive to retaliate against Beaulieu and that she persuaded her friends to assist her. (See *People v. Szeto* (1981) 29 Cal.3d 20, 28 [accomplice's testimony "was corroborated by independent evidence that defendant had a *motive* to aid the killers in escaping punishment"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1178 [evidence independent of the accomplice's testimony "established both a motive and opportunity for [the defendant] to participate in [the victim's] murder"]; cf. *Rodriguez, supra*, 4 Cal.5th at p. 1129 [corroborating evidence was insufficient where "there was no evidence establishing a personal motive or opportunity to commit the charged crimes" and the corroborating evidence "could do no more than establish the crimes occurred and raise a suspicion against every . . . gang member" in the county].)

Though Tate and Bryant did not witness the shooting, Smith told them significant details that showed Smith actively participated in killing Beaulieu. Tate and Bryant both testified that, after Smith and Alvarado returned to the house at the end of the evening, Smith described her role in the shooting: Smith announced, "We got him," and told Tate she would have been the shooter but Alvarado took the gun away from her. Smith also described to Bryant how they passed the gun around.

Finally, Tate and Bryant testified about comments Smith made to Alvarado after the shooting that corroborated

15

McCollum's and Reynolds's testimony:  Tate described Smith comforting a distressed Alvarado ("we're in this together" and "we did this together").  The jury reasonably could have inferred these statements reflected Smith's admission she was an equal partner in the shooting.  (See *People v. Whalen* (2013) 56 Cal.4th 1, 56 [jury could have concluded the defendant's statement to a detective, ""'I was expecting to get picked up sooner or later,'"" was "an admission by defendant of his connection to the robbery and murder"].)  The jury also reasonably could have inferred Smith's promise to get a tattoo of Alvarado's name indicated she took pride in and ownership of what Alvarado did for her, which further connected Smith to the shooting.  (See *People v. Dalton*, *supra*, 7 Cal.5th at p. 245 [defendant's statement, in response to a question why she killed the victim, the victim "'was a rat' who 'deserved to die'" connected the defendant to the victim's murder "independent of [the accomplice's] testimony"].)

The vivid details from Tate's and Bryant's testimony also corroborated key details from McCollum's and Reynolds's accounts of Smith's role:  Smith expressed her need to retaliate against the people who fired shots at her house, enlisted Alvarado to help her, and provided (at a minimum) companionship and encouragement to Alvarado (and told Tate that she almost carried out the shooting herself).[11]  The

_____

[11]     There is no support for Smith's assertion "no independent evidence placed [her] at the scene at the time of the shooting." Tate testified Smith left with Alvarado and McCollum late in the evening and returned to the house with them.  And, as discussed, Smith made numerous statements back at the house that indicated she was present at the scene of the shooting.

16

descriptions by Tate and Bryant of Smith's conduct after the shooting (comforting Alvarado, fabricating an alibi, and telling the group to "take it to the grave") also corroborated statements by McCollum that described Smith as the ringleader. Indeed, Tate described Smith the "aggressor,"[12] and Bryant called Smith the "mastermind." The independent evidence reasonably connected Smith to the murder of Beaulieu and permitted the jury to conclude McCollum and Reynolds were telling the truth. (See *People v. Jasso*, *supra*, 17 Cal.5th at pp. 684-685; *Hall*, *supra*, 104 Cal.App.5th at p. 1092 ["The evidence simply must support the accomplice testimony and permit a reasonable inference that the accomplice's testimony is true."].) The evidence sufficiently corroborated the accomplices' testimony. (See *Romero and Self*, *supra*, 62 Cal.4th at pp. 32-33; *People v. Szeto*, *supra*, 29 Cal.3d at pp. 25-26.)

Citing *Rodriguez*, *supra*, 4 Cal.5th 1123 and *Hall*, *supra*, 104 Cal.App.5th 1077, Smith argues, "No physical evidence" "tied [her] to the gun, casings, or car used in the shooting." Perhaps not. But, as discussed, plenty of other evidence did. Contrary to

---

[12] Smith asserts that, when Tate called Smith the aggressor, "her statements were stricken as speculative." The record does not support that assertion. Tate testified she told the detectives that Smith was the aggressor because she was "the one who called" Alvarado to come and "do whatever they did, to pick her up, whatever." Counsel for Smith objected to the phrase "to do whatever they did" on the grounds the answer was based on speculation and lacked foundation. The court ruled "that part will go out" and instructed the jury to "disregard that part of her answer." The court did not strike Tate's opinion Smith was the aggressor and in fact allowed Tate to explain the basis of her opinion.

17

Smith's assertion, *Rodriguez* did not "evince that the type of corroboration envisaged is indubitably physical evidence that placed the defendant at the scene." The Supreme Court in *Rodriguez* stated that in that case neither "the eyewitness testimony" nor "the physical evidence of the murder weapon . . . tended to connect [the defendant] to the commission of the crime." (*Rodriguez*, at p. 1128.) The Supreme Court did not limit corroborating evidence to physical evidence. In *Hall* the court observed "the GPS pings" on the defendant's ankle monitor, the presence of stolen items in the defendant's trunk, a surveillance video, and the codefendant's social media posts corroborated the accomplice's testimony. (*Hall*, at p. 1092.) The court did not say only physical evidence suffices to tie the defendant to the commission of the crimes.[13]

---

[13] Smith does not really argue in a cognizable way the evidence did not sufficiently corroborate McCollum's and Reynolds's testimony in connection with her convictions for attempted murder and conspiracy to commit murder. Smith mentions these convictions in two sentences: (1) "Reviewing the evidence admitted . . . [and] removing the accomplice statements, there is no solid evidence that supports the first-degree murder, attempted murder and conspiracy convictions"; (2) "Since the accomplice testimony against appellant was not sufficiently corroborated, her convictions must be reversed." Smith does not develop these arguments as they relate to her convictions for attempted murder and conspiracy to commit murder (to the extent she is making them) and does not provide any citations to the record or relevant case authority. (See *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 ["We discuss those arguments that are sufficiently developed to be cognizable. To the extent defendant perfunctorily asserts other claims, without

18

B.    *Counsel for Smith Did Not Provide Ineffective Assistance in Closing Argument*

Smith argues her trial counsel rendered ineffective assistance because "he failed to argue there was insufficient corroborative evidence to convict," a failure Smith says "effectively conceded her guilt"; advanced an argument that "was 'not recognized as a lawful defense'" (capitalization omitted); and portrayed Smith in an offensive manner by making a comment about "'how women operate.'"  Counsel for Smith was not ineffective, however, for failing to make an argument that was meritless.  In addition, the arguments Smith characterizes as "not viable" or "insulting to the victim and offensive" fell within the wide range of prevailing professional norms.

1.    *Relevant Proceedings*

Counsel for Smith focused his closing argument on the unreliability of the witnesses who testified against Smith, the "different set of rules" that applied in the "world" of gangs, and why it did not make sense Smith was the "mastermind" of the crimes the People accused her of committing.  Counsel for Smith also emphasized the prosecution's burden to prove Smith did not kill in the heat of passion, Smith's "maternal instincts" to protect her baby, and Beaulieu's actions that provoked Smith to act "rashly."

---

development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis."]; *People v. Benson* (2025) 110 Cal.App.5th 1068, 1078, fn. 2 [same]; Cal. Rules of Court, rule 8.204(a)(1)(B), (C).)

When discussing Beaulieu's role, counsel stated: "I don't think there's any question that . . . [Beaulieu] and his homie set into motion what ultimately culminated in his death. Now, I'm not saying it's not a tragedy. I'm not saying it's not a loss. But don't get hung up on 'this poor guy is dead, so we have to make her pay for it,' because the reality is, [Beaulieu] and his homie really started this."

When discussing the provocation element of voluntary manslaughter, counsel argued: "Defendant was provoked. Well, you shooting into a house where you know she lives with her baby, I think that's sufficient provocation for anybody, for any mother. As a result of the provocation, the defendant acted rashly under the influence of intense emotion that obscured her reasoning and judgment." Counsel concluded: "In deciding whether the provocation is sufficient, consider whether a person of average disposition in the same situation, knowing the same facts, would have reacted . . . from passion rather than from judgment. I think it's safe to say that the average person would be likely to do so under these circumstances, under these facts, the average mother of a newborn."

### 2.    *Applicable Law and Standard of Review*

"'When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have

been different.  When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance.'" (*People v. Jasso*, *supra*, 17 Cal.5th at p. 675; see *People v. Dunn* (2025) 18 Cal.5th 129, 169.)  "'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.  [Citation.]' [Citation.]  These standards apply with particular force at closing argument because, as we have recognized, '[t]he decision of how to argue to the jury after the presentation of evidence is inherently tactical.'" (*People v. Gamache* (2010) 48 Cal.4th 347, 391; see *People v. Aguirre* (2025) 18 Cal.5th 629, 679 ["When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was no conceivable tactical purpose for counsel's act or omission." (Internal quotation marks omitted.)].)

"The mere fact that the issue could have been argued differently, or with a different emphasis or focus, does not establish ineffective assistance." (*People v. Mincey* (1992) 2 Cal.4th 408, 471; see *People v. Fairbank* (1997) 16 Cal.4th 1223, 1251 ["Closing argument is as much an art as a science."].) "[S]ensible concessions are an acceptable and often necessary tactic." (*People v. Gamache*, *supra*, 48 Cal.4th at p. 392; see *People v. Ochoa* (1998) 19 Cal.4th 353, 435 ["'good trial tactics often demand complete candor with the jury, and . . . in light of the weight of the evidence incriminating a defendant, an attorney may be more realistic and effective by avoiding sweeping

21

declarations of his or her client's innocence"'"]; *People v. Davenport* (1995) 11 Cal.4th 1171, 1237 ["'Recognizing the importance of maintaining credibility before the jury, we have repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt.'"].)

> 3. *Counsel's Closing Argument Fell Within the Wide Range of Reasonable Professional Assistance*

Counsel for Smith's failure to argue CALCRIM No. 335 required evidence independent of the accomplices' statements to tie Smith to the shooting was not ineffective. Counsel pointed out McCollum "was lying" to "save herself," but stopped short of saying the non-accomplice evidence did not corroborate McCollum's statements (because it did). As discussed, among other evidence, Tate's and Bryant's testimony connected Smith to Beaulieu's murder. Counsel reasonably decided not to make an unmeritorious argument. (See *People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile."]; *People v. Brannon-Thompson* (2024) 104 Cal.App.5th 455, 465 ["'Counsel is not ineffective for failing to make frivolous or futile motions' [citation], or for failing to object when 'there was no sound legal basis for objection.'"]; *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092 ["Counsel's failure to make a futile or unmeritorious objection is not deficient performance."].) Counsel neither "withdrew a crucial defense" nor conceded Smith's guilt in Beaulieu's murder.

Counsel's argument the jury should not "get hung up on" Beaulieu's death and make Smith "pay for it" was essentially an

argument that just because there is a murder victim did not mean Smith committed the murder. Counsel's comment that, "the reality is [Beaulieu] and his homie really started this," placed the shooting at the Carmelitos housing project in context with the shooting at Bryant's house. This was a reasonable attempt to make Smith seem less blameworthy. Contrary to Smith's assertion, these comments did not suggest "the victim deserved it." Counsel made a point of acknowledging the "tragedy" of Beaulieu's death and stated, "There are no winners here, no matter how this comes out." Smith has not shown her trial counsel did not have a "conceivable tactical purpose" (*People v. Aguirre*, *supra*, 18 Cal.5th at p. 679, internal quotation marks omitted) for framing his argument as he did. (See *Yarborough v. Gentry* (2003) 540 U.S. 1, 6 ["Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' [citation], but which issues to sharpen and how best to clarify them are questions with many reasonable answers."].)

Counsel's argument that Smith, as the "average mother of a newborn," acted "out of passion" and "not out of gang allegiance" was a reasonable means to expand on his argument Beaulieu's "evil" and "reckless" conduct "provoked" Smith to respond "rashly." Stating he did not believe the People would be able to prove Smith committed any crime, counsel for Smith argued, in an effort to persuade the jury to find Smith guilty voluntary manslaughter rather than murder, the evidence showed Beaulieu provoked Smith to act rashly. Counsel focused on Smith's discovery of bullet holes in her home—where one of the bullets could have killed her baby (had the baby been there)—and argued anyone with a newborn would have acted as Smith did. Given the overwhelming evidence connecting Smith to the

shooting, counsel logically attempted to portray Smith as a new mother who was only trying to protect her child. (See *People v. Mayfield* (1993) 5 Cal.4th 142, 177 [counsel's effort "to persuade that [the victim's] murder stemmed from a rash impulse rather than a calculated decision" was an attempt "'to make the best of a bad situation,' given his very limited options"]; *People v. Midell* (2025) 113 Cal.App.5th 1060, 1079 [because "challenging the mental state element was a reasonable—if not the only—defense available to" the defendant, counsel had a "conceivable tactical reason" to "use animal references to attempt to convince the jury that [the defendant] did not act with specific intent"]; *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1169 [counsel's "negative comments" about the defendant during closing argument "was not constitutionally ineffective" because "counsel's argument appears to have been a calculated strategy to concede the near inevitable outcome on certain charges in order to gain credibility with the jury and pursue acquittal on charges where the evidence was not as strong"].) The record does not support Smith's argument her trial counsel's strategy "could only have incentivized jurors, especially female jurors, to vote guilty." The court instructed the jury to "impartially compare and consider all the evidence that was received throughout the entire trial" and that "nothing the attorneys say is evidence." We presume the jury followed the court's instructions. (See *People v. Krebs* (2019) 8 Cal.5th 265, 335 ["'Absent some showing to the contrary, we presume the jury followed the court's instructions.'"].)

24

C. *The Court Did Not Abuse Its Discretion in Imposing the Middle Term*

Smith argues the court failed to "make a specific finding that . . . [her] youth was not a contributing factor in the commission of the crime" and asks us to direct the trial court to "comply with the lower term presumption" under section 1170, subdivision (b)(6), or to "make a specific finding, on the record, that [her] youth was not a contributing factor in the commission of the crime."  To the extent the court failed to make any youth-related findings, the court did not abuse its discretion because Smith did not present any evidence the factors listed in section 1170, subdivision (b)(6), applied to her.

1. *Relevant Proceedings*

At sentencing counsel for Smith told the court that Smith wanted to have a hearing under *People v. Franklin* (2016) 63 Cal.4th 261,[14] but that he did not represent defendants in "*Franklin* hearings."  The court stated that it could appoint

---

[14] In *People v. Franklin*, *supra*, 63 Cal.4th 261 the Supreme Court held section 3051, "which requires the Board [of Parole Hearings] to conduct a 'youth offender parole hearing,' during the 15th, 20th, or 25th year of a juvenile offender's incarceration" mooted the defendant's "challenge to his original sentence" under the United States Supreme Court's decision in *Miller v. Alabama* (2012) 567 U.S. 460.  (*Franklin*, at pp. 277, 280; see Stats. 2013, ch. 312, § 4.)  "A *Franklin* proceeding gives 'an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to "give great weight to" youth-related factors [citation] in determining whether the offender is "fit to rejoin society."'"  (*In re Cook* (2019) 7 Cal.5th 439, 449.)

counsel to represent Smith at a *Franklin* hearing if counsel did not feel prepared and that the court was "well aware of" Smith's age and would take her age "into consideration." The court stated the *Franklin* hearing would not change Smith's sentence and reiterated it was "taking into consideration all information that's available" about Smith's age and "the circumstances of this case." Counsel for Smith argued the evidence from the trial showed that Beaulieu was one of the shooters who fired bullets into Bryant's house and that "what was portrayed as a cold-blooded murder started to look more like a manslaughter and an attempted manslaughter." Counsel stated there was "no question" Beaulieu's conduct would "arouse passions in a mother" and argued: "I'm no doctor. I'm no [obstetrician-gynecologist], but . . . you know, there are postpartum effects that come after pregnancy. I'm not saying . . . that affected her judgment. I have no idea. But I do know that she had a right to be upset. I do know that any reasonable person would be extremely upset about the danger that their child could have been in that day, over something that she had nothing to do with."

Counsel asked the court to sentence Smith to a term of 25 years to life on the murder conviction and a concurrent term of seven years on the attempted murder conviction and to "not impose" the firearm enhancements. The prosecutor asked the trial court to sentence Smith "to the maximum."

The court stated it "considered a lot of factors in this case," including that the two victims in this case, "whether they were gang members or not," "had a right, whatever they did, to face the justice system as opposed to someone's decision to take ahold of the justice system and use if for their own purposes." The court concluded "revenge seems to be what this case was about."

26

The court acknowledged Smith was 22 years old at the time she committed the crimes and that she would receive a youth offender parole hearing.  The court stated:  "I understand all of the allegations, and I understand the one circumstance in consideration is the defendant's age.  However, that is being considered through the mechanism that was provided for consideration of that."

The court sentenced Smith to a term of 25 years to life on the murder conviction, plus the middle term of two years for the firearm enhancement under section 12022, subdivision (d).  On the attempted murder conviction, the court imposed the middle term of seven years, plus one-third the middle term of eight months for the firearm enhancement under section 12022, subdivision (d).  The court commented, "This gentleman [James] deserves some justice also."  The court imposed and stayed execution of a term of 25 years to life on the conviction for conspiracy to commit murder.

### 2.    *Applicable Law and Standard of Review*

Section 1170, subdivision (b)(1), states:  "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)."[15]  Section 1170,

---

[15]    Section 1170, subdivision (b)(2), provides the court may impose a sentence exceeding the middle term "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been

27

subdivision (b)(6), states, "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense.[16] [¶] (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking." (See *People v. Salazar* (2023) 15 Cal.5th 416, 419 [section 1170, subdivision (b)(6), "creates a presumption that the sentencing court 'shall' enter a lower term sentence when, among other things, a 'psychological, physical, or childhood trauma' contributed to the offense"]; *People v. Sarmiento-Zuniga* (2025) 108 Cal.App.5th 1216, 1224 [same]; *People v. Fredrickson* (2023) 90 Cal.App.5th 984, 986-987 (*Fredrickson*) [same].)

We review the trial court's sentencing decisions for abuse of discretion. (*People v. Salazar*, *supra*, 15 Cal.5th at p. 428, fn. 8; *People v. Sandoval* (2007) 41 Cal.4th 825, 847.) "The trial court's

---

stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (See *People v. Lynch* (2024) 16 Cal.5th 730, 742.)

[16] Section 1016.7, subdivision (b), defines a youth as "any person under 26 years of age on the date the offense was committed."

sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.'" (*Sandoval*, at p. 847.) "'To prove an abuse of discretion, "'[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."' [Citation.] To meet this burden, the defendant must "affirmatively demonstrate that the trial court misunderstood its sentencing discretion."'" (*Fredrickson*, *supra*, 90 Cal.App.5th at p. 988; see *People v. Caparrotta* (2024) 103 Cal.App.5th 874, 905 ["'In the absence of evidence to the contrary, we presume that the court "knows and applies the correct statutory and case law."'"].) "We may not presume error from a silent record." (*People v. Knowles* (2024) 105 Cal.App.5th 757, 765.)

> 3.  *Smith Has Not Shown the Lower Term Presumption Under Section 1170, Subdivision (b)(6), Applied*

Although the court did not discuss section 1170, subdivision (b)(6), at the sentencing hearing, we presume the court was aware of the statutory presumption to impose the lower term. (See *People v. Caparrotta*, *supra*, 103 Cal.App.5th at p. 905.) But even if the court failed to consider whether Smith's youth contributed to her conduct in committing the crimes, the

court did not abuse its discretion because nothing in the record showed the provision applied to Smith.

As discussed, section 1170, subdivision (b)(6), "establishes a rebuttable presumption that the court impose the lower term if any of three specified circumstances was a contributing factor in the commission of the offense." (*People v. Sarmiento-Zuniga, supra*, 108 Cal.App.5th at p. 1225; see *People v. Hilburn* (2023) 93 Cal.App.5th 189, 205 [the lower term "is presumed only if the sentencing court first finds the defendant falls into one of the three special categories set forth in section 1170, subdivision (b)(6) and, second, finds that circumstance was a contributing factor in the commission of the offense"].) "The statute does not mandate a presumption in favor of the lower term in every case in which the defendant was under age 26 at the time the crime was committed. Instead, the presumption applies only if the defendant's youth was 'a contributing factor' in his or her commission of the offense." (*Fredrickson, supra*, 90 Cal.App.5th at p. 991; see *People v. Knowles, supra*, 105 Cal.App.5th at p. 765 ["As made plain by the statutory text, the mere fact a defendant is young or has suffered past trauma is insufficient—either or both must be 'a contributing factor in the commission of the offense' for the low term presumption to apply."].) Thus, "in order to trigger the presumption, there must be some initial showing that the defendant's youth was a contributing factor, and only then must the record affirmatively show compliance with the statute." (*Fredrickson,* at p. 992.)

Smith does not cite anything in the record, including the probation officer's report, that indicates her youth contributed to

her committing the crimes in this case.[17] There was no evidence that she succumbed to the influence of someone older or more sophisticated or that she was only tagging along for the ride. Indeed, the evidence showed Smith rallied her friends to join her in a planned operation to retaliate against the person that she believed had endangered her baby. Smith called the shots (literally), concocted an alibi, and made her accomplices swear to keep their crimes a secret until death. The court did not abuse its discretion in sentencing Smith to the middle term. (See *Fredrickson, supra*, 90 Cal.App.5th at p. 994 [where there was "no clear indication" from the record the defendant's youth was a contributing factor to her commission of the offense, "the trial court's failure to expressly consider the lower term presumption" did not require a remand]; see also *People v. Wilson* (2025) 111 Cal.App.5th 1020, 1042 [where the trial court found there was no evidence the defendant suffered from "'any mental insufficiency'" or "'was a victim of violence,'" the court "did not abuse its discretion in sentencing [him] to the middle term"].)

### D. *Counsel Was Not Ineffective in Representing Smith at Her Sentencing Hearing*

Smith argues her trial counsel provided ineffective assistance at the sentencing hearing by failing (1) to argue section 1170, subdivision (b)(6), "created a presumption in favor of the low[er] term"; (2) to consult with an expert "on the impact postpartum had on [her] conduct"; (3) to argue her lack of felony

---

[17] The initial showing "need not be made by the defendant; the showing could be made by the prosecution or by facts or recommendations in a probation officer's report." (*Fredrickson, supra*, 90 Cal.App.5th at p. 994, fn. 8.)

31

prior convictions; and (4) to "present evidence of youth-related mitigating factors." (Capitalization omitted.) Smith asks us to remand the matter for a new sentencing hearing for her counsel to present "evidence of youth-related and other pertinent mitigating factors."

Counsel for Smith's failure to discuss section 1170, subdivision (b)(6), or the statutory presumption for imposing the lower term was not ineffective assistance. As discussed, nothing in the record indicated any of the mitigating factors contributed to Smith's commission of the crimes. (See *Fredrickson*, *supra*, 90 Cal.App.5th at p. 995 [where there was no indication in the record the defendant's youth contributed to her commission of the offense, counsel was not ineffective in failing to argue the lower term presumption applied].) Even if counsel had made the argument, there is no reasonable probability of a more favorable outcome because there was no evidence to support applying the presumption in section 1170, subdivision (b)(6). (See *People v. Tilley* (2023) 92 Cal.App.5th 772, 778 [because the defendant made "no argument on appeal that he experienced trauma; that there was evidence of trauma the trial court failed to consider; or that his mental illness resulted in psychological trauma," he "failed to establish it is reasonably probable the court would have sentenced him to the lower term if counsel had objected to the imposition of the middle term"].) Contrary to Smith's assertion, counsel's failure to discuss section 1170, subdivision (b)(6), did not necessarily reflect his ignorance of the provision; it just as easily could have reflected his awareness there was no evidence to support an argument the statutory presumption for the lower term applied. Because Smith cannot show there was no conceivable tactical purpose for counsel's omission, she has not

32

shown her counsel was ineffective.  (See *People v. Aguirre, supra,* 18 Cal.5th at p. 679; *People v. Wilson, supra,* 111 Cal.App.5th at p. 1032.)

As for Smith's assertion her counsel should have consulted with an expert, counsel's statement he was not an obstetrician-gynecologist did not necessarily imply he failed to consult with one.  But even if he did not consult with a medical expert, Smith has not pointed to anything in the record that should have alerted counsel to consult with an expert.  Counsel's speculative argument "there are postpartum effects that come after pregnancy" was not a representation Smith actually suffered from these effects, which Smith has left largely undefined in her briefs.  Nothing in the record showed that Smith had any kind of psychological trauma or, more to the point, that any psychological trauma contributed to her commission of the crimes.  (See *People v. Banner* (2022) 77 Cal.App.5th 226, 241 [the psychological trauma "must contribute to the crime under section 1170, subdivision (b)(6)"].)  To the contrary, the evidence showed Smith acted deliberately, with determination, and with sophistication.  (See *People v. Wilson, supra,* 111 Cal.App.5th at p. 1042 [contrary to the defendant's argument his "'borderline intellectual functioning'" contributed to his commission of the offenses, the evidence showed he "'acted with a level of sophistication'" in committing his crimes].)

Counsel's failure to present evidence Smith's youth was a contributing factor to her criminal conduct was not deficient because nothing in the record (e.g., the facts of the crimes or Smith's probation report) suggested this evidence existed.  (See *Fredrickson, supra,* 90 Cal.App.5th at p. 995 [absent any indication in the record the defendant's youth "was a

'contributing factor' in her commission of the underlying offense," "we cannot conclude counsel was deficient in failing to present information that may or may not exist"].) The record shows revenge was what drove Smith to hunt down and murder Beaulieu, and Smith does not point to any evidence her youth contributed to her role in leading her confederates to commit the crimes in this case.

Finally, counsel's failure to argue Smith did not have any prior felony convictions, even if it fell below an objective standard of reasonableness, did not prejudice Smith because the probation report contained a record of her criminal history. We presume the trial court considered all material relevant making its sentencing choices. (See *People v. Bravo* (2025) 107 Cal.App.5th 1144, 1157 ["'we presume that the trial court knew the law and followed it'"]; Cal. Rules of Court, rule 4.409 ["Relevant factors enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise."].)[18] Because Smith cannot demonstrate her counsel's omission was prejudicial, she cannot establish counsel was ineffective. (See *People v. Jasso*, *supra*, 17 Cal.5th at p. 675.)

---

[18] One of the factors in mitigation under California Rules of Court, rule 4.423(b)(1), is: "The defendant has no prior record, or has an insignificant record of criminal conduct, considering the recency and frequency of prior crimes." Though Smith did not have any prior felony convictions, her probation report indicated she had been convicted of several misdemeanors.

## DISPOSITION

The judgment is affirmed.

SEGAL, J.

We concur:

MARTINEZ, P. J.

FEUER, J.